STANDARD FRUIT & S. S. CO. *v.* UNITED STATES

No. 4734.—Invoices dated Belfast, Ireland, March 22, 4, 1935.
Entered at New Orleans, La., February 27, April 10, March 20, 1935.
Entry Nos. 1938 and 1939, 2340, 2125.

(Decided February 20, 1940)

*Philip Stein* for the plaintiff.
*Webster J. Oliver*, Assistant Attorney General (*Samuel D. Spector* and *Richard E. Fitz Gibbon*, special attorneys), for the defendant.

CLINE, Judge: These are appeals to reappraisement taken under the provisions of section 501 of the Tariff Act of 1930 from values found by the United States appraiser at the port of New Orleans on certain steam electric generating sets and spare parts imported from Belfast, Ireland.

The merchandise in each case consists of two vertical reciprocating steam engines, each with an electric generator and certain spare parts. The three units of engines and generators were imported to be installed in the engine rooms of three of the plaintiff's vessels for use in connection with refrigeration machinery. Each of the units was identical and interchangeable, and with each importation a set of spare parts for the steam engines was included so that in the event of a breakdown at sea shipboard repairs would be possible, and there were also furnished extra sets of carbon brushes for the generators.

The record shows that prior to the purchase of the units in question plaintiff had purchased a similar unit for one of its ships, and the instant shipments were repeat orders of the same equipment. The purchase was made by the plaintiff through its agent, James Maxton & Co., of Belfast, from the Sunderland Forge & Engineering Co., Ltd., of Belfast, the facts of the purchase being that plaintiff inquired through its agent the price of such units and spare parts and upon being quoted a price which equalled the invoiced and entered value accepted it as fair and reasonable and placed the order. The price quoted was £32 less than had been paid on the prior order, which plaintiff's marine superintendent, who had charge of the purchase of the units in issue, assumed to be due to the fact that the manufacturer was able to make a saving because of mass production.

From a report signed by Treasury Representative Ronald N. Marquis under date of January 30, 1936, which is in evidence as Exhibit 1, it appears that the Sunderland Forge & Engineering Co. of Belfast placed an order with its subsidiary, the Sunderland Forge & Engineering Co., Ltd., of Sunderland, England, for the electric generators and spare carbon brushes in issue, and that they placed an order with the firm of Belliss & Morcom, Ltd., of Birmingham, England, with which they had no connection, for the six steam engines and spare parts therefor here in question.

It will be noted that the merchandise in issue was purchased and imported as units of two steam engines and two generators. While the engines and generators were intended to be used together the evidence indicates that they were separate articles of commerce, not necessarily designed to be used together.

From a perusal of Exhibit 1 it appears that the generators were supplied by the Sunderland Co. of Sunderland, England to the Belfast Co. at £227.10.0 each, together with shunt regulators at £5.0.0 each, and spare carbon brushes at £6.0.0 per set, all less 2½ per centum discount. The report states as to the discount—

There are no freely offered discounts, either trade or cash.

There was a special discount of 2½% arranged with the Belfast house on the instant transaction.

Obviously, therefore, such discount cannot be taken into consideration in determining the value of the merchandise under section 402 of the Tariff Act of 1930.

Eliminating the discount, the price of the generators and shunts supplied in the instant case was £227.10.0 each for the generators and £5.0.0 for the shunts, or a total of £232.10.0. They were appraised at £239.0.0 for the combination of generator and shunt.

With respect to sales of such or similar merchandise the report, Exhibit 1, contains the following:

> The identical generators have been sold in the home market by the manufacturer.
>
> Mr. Moor [General Secretary of the Sunderland Co. of England] explained however, that while all of these generators are of a similar construction, that each engineer who may be using the machines will have his own ideas as to his particular requirements, so, therefore, there may be slight differences, such as the speed at which it will run, the electrical output, etc. But the size of the frame is the basis on which the price depends.
>
> The generators in question were 23 x 9, i. e., the armature was 23 inches long by 9 inches in diameter.

The invoice of a sale of three 23 x 9 generators made September 20, 1935, is thereupon quoted by the Treasury representative, the price being £239.0.0 each for the generators and shunts, plus £4.10.0 for an extra set of brushes.

The report continues:

> There has been no change in the manufacturer's prices for the past two years.
>
> The manufacturer admitted that the price on the generators in question for the Standard Fruit & Steamship Co. had been reduced on account of the quantity purchased.
>
> &ast;  &ast;  &ast;  &ast;  &ast;  &ast;  &ast;
>
> The usual wholesale quantity of generators sold at a time in the home market is from one to six, with the most usual number being two.

On behalf of the plaintiff there was offered in evidence an affidavit, which was admitted as Exhibit 2, executed by one Reginald H. Gough, who therein identified himself as a director of the Sunderland Forge & Engineering Co., Ltd., of Sunderland, England, and who, after reciting facts which indicate his qualifications to make such an affidavit, stated:

> That the wholesale prices at which the above-described merchandise was sold were the freely offered for sale prices to all purchasers in the principal markets of Great Britain for use and consumption in Great Britain in the regular course of trade at or about the time the above-described merchandise was exported to the United States. That the prices were the same for export to the United States for the same type of merchandise.
>
> That identical merchandise as above described or merchandise of the same type at or about the date of exportation of the above-described merchandise to the United States was freely offered to all purchasers in the principal market of Great Britain in the regular course of trade.

The affiant treats the unit, consisting of a vertical reciprocating steam engine and the electric generator, as an entirety and states that the invoice price is the price at which the unit was offered for sale and sold in the markets of Great Britain at the time of the exportations in this case, yet it is shown by the customs agent's report, Exhibit 1, that Sunderland Forge & Engineering Co., Ltd., of Sunderland, England, the company with which the affiant is connected, manufactures the generators and spare parts only and that the steam engines were manufactured and sold by Belliss & Morcom, Ltd., of Birmingham, England to the Sunderland Forge & Engineering Co., Ltd., of Belfast, Ireland. The Treasury representatives report the following with respect to the investigation at the place of business of Belliss & Morcom, Ltd., at Birmingham:

In the instant case, this manufacturer sold the engines to the Sunderland Forge & Engineering Co. to be used in connection with the generators manufactured by that firm. Mr. Stokes informed me that the usual practice of his firm was to buy the generators from a manufacturer and sell the complete generating set to a customer, but that in this case, the position was the reverse, the manufacturer of the generators had sold the complete set and had purchased the engines from them.

The affiant who executed the affidavit in Exhibit 2, in describing his qualifications, states that he has "supervision of estimates, tenders and sales of steam engines and electric generators in the British and Overseas markets including export to the United States" and that he is familiar with the shipments herein involved. He failed to point out a single sale or offer for sale of merchandise such as or similar to that involved which formed the basis for the statements as to prices in wholesale quantities. He states "that six is a usual wholesale quantity to be sold and freely offered to everyone in the principal market for consumption in Great Britain and for export to the United States" but offers no evidence showing that the units in quantities of six were sold in the markets of Great Britain at or immediately prior to the shipments in this case. The statement of deponent, without showing basis therefor, is a mere conclusion. *Jenkins Bros.* v. *United States*, 25 C. C. P. A. 90, T. D. 49093; *United States* v. *Semon Bache*, 25 C. C. P. A. 387, T. D. 49466; *United States* v. *Hensel, Bruckmann & Lorbacher, Inc.*, 1 Cust. Ct. 591, Reap. Dec. 4376. In the latter case the court said:

A wholesale quantity is not governed by a buyer's idea of what it should be but rather by the quantity in which a given article is usually bought and sold. These affidavits afford us no light in that regard. Therefore, it is our opinion that the conclusions expressed in said affidavits are not based upon any facts which show that the affiants are qualified to express an opinion as to what is a wholesale quantity, or as to the price at which steel tubing in the usual wholesale quantities, and the ordinary course of trade, is freely offered for sale.

With respect to the steam engines and spare parts therefor manufactured and sold by Belliss & Morcom, Ltd., of Birmingham, the report of the Treasury representative shows that there was a standard base price for the bare engine of £360.0.0 plus 5 per centum, and that the price of the extras (not spare parts) ordered for each engine was £78.0.0. From the total price of the completed engine a discount of 2½ per centum was allowed the Sunderland Co., but, as in the case of the generators, the report indicates that this was not a usual discount and was allowed because of the quantity purchased. The report also shows that a "standard set of spare parts for a shipboard job, i. e., a set of spares for each two engines" were sold at £118.0.0 per set. It is shown also that a sale of the same engines was made in Great Britain at £378.0.0 and that delivery thereof was made on March 25, 1935 which is within a few days of the date of shipment of the merchandise herein involved.

I am of opinion that the report of the Treasury representatives, Exhibit 1, is entitled to greater weight than the affidavit, Exhibit 2. The plaintiff's witness, Mr. John Low, furnished no evidence regarding the value of the articles in Great Britain. I find that the values at which the shipments were appraised were the values at which the merchandise was freely offered for sale in the usual wholesale quantities of one or more units in the principal markets of Great Britain at and immediately prior to the dates of exportation of the articles herein involved and that no higher values for export to the United States are established by the record. I hold that the articles are dutiable at the foreign values, as defined in section 402 (c) of the Tariff Act of 1930 and that such values are the values found by the appraiser. Judgment will be entered accordingly.